Associated Packaging, Inc. v. Jackson Paper Mfg. Co., 2012 NCBC 13.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
|---|---|
| COUNTY OF JACKSON | 10 CVS 745 |

ASSOCIATED PACKAGING, INC.,
SIRROD LLC, WILLIAM CRAIG
DORRIS, BRADLEY FRANKLIN
DORRIS, WILLIAM SCOTT DORRIS,
CENTRAL FLORIDA BOX CORP.,
CFB ASSOCIATES, LLC, and
JEFFREY T. RAMSEY,

        Plaintiffs,

   v.

JACKSON PAPER
MANUFACTURING COMPANY,
JEFFREY L. MURPHY, TIMOTHY L.
CAMPBELL, THOMAS C. DAVIS,
CAPSTONE PARTNERS LLC, and
GARY WEST,

        Defendants.

**ORDER AND OPINION**

*Smith Moore Leatherwood LLP by Jonathan P. Heyl and Heather C. White for Plaintiffs.*

*McKenna Long & Aldridge LLP by Gregory S. Brow and E. Claire Carothers for Defendants Jackson Paper Manufacturing Company, Jeffrey L. Murphy, and Timothy L. Campbell.*

*Coltrane Aycock & Overfield, PLLC by George W. Aycock, III for Defendants Thomas C. Davis and Capstone Partners LLC.*

*Hunton & Williams LLP by Patrick L. Robson and Waller Lansden Dortch & Davis LLP by Lea Carol Owen for Defendant Gary West.*

Murphy, Judge.

{1}    **THIS MATTER** is before the Court upon Defendants' Motions to Dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

{2}    Defendants' motions seek dismissal of Plaintiffs' claims for (1) violation of the North Carolina Securities Act ("NCSA"), (2) negligence, and (3) negligent misrepresentation.

{3}    Having considered Plaintiffs' Complaint, the parties' briefs and submissions, and the arguments and contentions of counsel at the June 13, 2011 hearing, the Court **DENIES** Defendants' Motions to Dismiss.

I.

PROCEDURAL HISTORY

{4}    Plaintiffs jointly filed their Complaint on October 29, 2010.  (Compl. 29.)

{5}    This matter was transferred to the North Carolina Business Court as a mandatory complex business case on November 2, 2010, and subsequently assigned to me on March 15, 2011.  (Assignment Order 1.)

{6}    Defendants Jackson Paper Manufacturing Co. ("Jackson Paper"), Timothy Campbell ("Campbell"), Jeffrey Murphy ("Murphy"), and Gary West ("West") filed their Motions to Dismiss and supporting briefs on January 14, 2011. (Jackson Paper, Campbell, and Murphy's Mot. to Dismiss 3; West's Mot. to Dismiss 3.)   Defendants Thomas C. Davis ("Davis") and Capstone Partners, LLC ("Capstone") filed their Motion to Dismiss and supporting brief on February 3, 2011. (Davis and Capstone's Mot. to Dismiss 2.)

{7}    Plaintiffs jointly filed their responsive brief on February 28, 2011. (Pls.' Resp. in Opp. to Defs.' Mots. to Dismiss 27.)  Defendant West filed his reply on April 8, 2011, and Defendants Jackson Paper, Murphy, Campbell, Davis, and Capstone filed their reply on April 12, 2011.  (West's Reply in Supp. of Mot. to Dismiss 13; Jackson, Murphy, and Campbell's Reply in Supp. of Mot. to Dismiss 12; Davis and Capstone's Reply in Supp. of Mot. to Dismiss 9.)

{8}    On June 13, 2011, the Court heard oral arguments on Defendants' Motions to Dismiss.

II.

STATEMENT OF FACTS

{9} While ordinarily the Court does not make findings of fact in connection with motions to dismiss, as such motions do "not present the merits, but only [determine] whether the merits may be reached," *Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986), for purposes of this Order and Opinion, the Court recites those facts from the pleadings that are relevant to the Court's legal determinations.

{10} The parties in this case are all involved in the paper and corrugated product industry. (Compl. ¶ 1.) In early 2007, Jackson Paper, led by Defendants Campbell and Murphy, began planning the development of a recycled liner board paper mill and sheet feeder corrugator plant (Stonewall Packaging, LLC, hereafter "Stonewall") that would support a group of smaller sheet plants who were looking to be more competitive with larger entities in the industry. (Compl. ¶¶ 2, 43.) To find investors for the project, Jackson Paper engaged Defendants Davis, Capstone, and West. (Compl. ¶¶ 41, 46–49.) Defendant Davis is a founding member of Capstone and was involved in the recruitment of potential investors in the project. (Compl. ¶ 18.) Defendant West was, during all times relevant to this action, the President of non-parties Custom Packaging, Inc., and Turkey Fields, LLC ("West's Affiliated Entities"), and a director of non-party Stonewall. (Compl. ¶ 17.) West and his Affiliated Entities were expected to purchase a significant portion of Stonewall's monthly output. (Compl. ¶ 68.)

{11} From 2007 through 2009, Defendants approached various individuals and companies within the industry hoping to identify potential investors for Stonewall. Defendants made presentations to Plaintiffs Associated Packaging, Inc. ("API"), William C. Dorris, Bradley F. Dorris, and William S. Dorris (collectively the "Dorrises") in the summer of 2007, and approached Plaintiffs Jeffrey T. Ramsey ("Ramsey"), and Central Florida Box Corp. ("CFB") in the spring of 2008. (Compl. ¶¶ 50, 89.)

{12}    Defendants Jackson Paper, Capstone, Campbell, Murphy, Davis, and West provided Plaintiffs with project summaries, pro formas, and projected financial results leading up to, and after, the time that Plaintiffs invested in Stonewall.  (Compl. ¶¶ 54, 57, 78, 88–96.)  Plaintiffs had an accountant review all financial information provided by Defendants. The accountant was unable to detect any irregularities.  (Compl. ¶ 109.)  In addition to providing financial projections for the company, Defendants also informed potential investors that West's Affiliated Entities "were committed to purchasing [from the project] 35 million board feet of product per month."  (Compl. ¶ 68.)  This commitment would have amounted to roughly thirty-three percent of the plant's projected output.  (Compl. ¶¶ 68, 76, 90, 92, 95.)  Defendants also represented to Plaintiffs that Jackson Paper had the "experience, expertise, knowledge, and trained personnel required" to manage construction and initial operations of the company, and in the future, would hire a plant manager and employees experienced and trained on the equipment.  (Compl. ¶¶ 116–119.)

{13}    On or about September 10, 2007, Defendant Davis requested that API and the Dorrises make an initial investment of $40,000 in Stonewall.  (Compl. ¶ 58.)  Plaintiff William C. Dorris expressed concern to Davis about financing the investment, and made it clear that API and the Dorrises would be relying on the projections provided by Defendants in making their investment because API and the Dorrises would have to borrow money to participate.  Mr. Dorris told Defendant Davis that API could not service repayment of the debt out of API's cash flow, and that the only way the project would work for them was if Stonewall's profit projections were consistent with Davis' representations.  (Compl. ¶¶ 59, 77.)  In response, Davis "assured Plaintiff William C. Dorris that the financial projections were accurate."  (Compl. ¶¶ 60, 77–78, 111.)  Relying on the financial projections provided by Defendants Davis and Capstone, along with the cooperation of Defendants Murphy and Campbell of Jackson Paper, Plaintiffs API and the Dorrises made initial investments of $40,000 in September 2007, $48,203 in October 2007, and $56,574 in August 2008.  (Compl. ¶¶ 59–65, 98.)

{14} Plaintiff Sirrod, LLC ("Sirrod") is a South Carolina limited liability company created by API and the Dorrises to facilitate additional investment in Stonewall after the initial outlays referenced above. (Compl. ¶¶ 7, 114.) Similarly, Plaintiff CFB Associates, LLC ("CFB Associates") was created by Plaintiffs CFB and Ramsey as their investment vehicle. (Compl. ¶¶ 115.) In August of 2008 Plaintiff CFB made its initial investment of $150,000 in Stonewall. (Compl. ¶ 99.) This was followed by Plaintiff Sirrod investing an additional $432,222, and Plaintiff CFB Associates investing $427,000 in July 2009. (Compl. ¶¶ 114–15.) These investments purchased membership interests in Stonewall. Personal guarantees from some of the Plaintiffs were also required to secure financing for equipment to be used in the plant. Plaintiff Ramsey guaranteed one of those loans. (Compl. ¶ 104.)

{15} Stonewall began operations in November 2009. (Compl. ¶ 125.) From the beginning, the company struggled and incurred large operating losses attributable to management failures in the construction and operation of the plant, shutdowns, and the use of inexperienced and undertrained employees. (Compl. ¶¶ 126–29.) These losses were compounded by Defendant West and his Affiliated Entities' decision not to purchase the 35 million board feet of product they had previously committed to buy. (Compl. ¶ 133.) Stonewall's losses from poor management eventually became so severe that the day-to-day management of the company was turned over to Sheets, LLC ("Sheets"), a professional management company with experience in the paper and corrugated products industry. (Compl. ¶ 134.)

{16} After Sheets assumed management responsibilities for Stonewall, Plaintiffs were informed by Jeff Schwarz, a Sheets member, that Stonewall would not be viable absent a large capital infusion. Mr. Schwarz also informed Plaintiffs "that there was no possibility that Stonewall could have met the projections Defendants had prepared." (Compl. ¶ 137.) After new financial information was prepared, the members of Stonewall decided that it was unlikely that Stonewall

would survive, and declined to make any additional capital investments into the project. (Compl. ¶ 138.)

{17} On June 9, 2010, by Order of the Superior Court of North Carolina, Jackson County, Stonewall entered receivership, and has ceased all operations. (Compl. ¶¶ 139–40.) Stonewall's receiver has been, and is currently, in the process of liquidating Stonewall's assets in an attempt to satisfy creditors. (Compl. ¶ 140.)

## III.
## LEGAL STANDARD

{18} On a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the question for the court is "'whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory.'" *Block v. County of Person*, 141 N.C. App. 273, 277, 540 S.E.2d 415, 419 (2000) (quoting *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).

{19} "The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Id.* at 277–78, 540 S.E.2d at 419.

{20} In considering a motion to dismiss for failure to state a claim upon which relief can be granted, "the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 613, 646 S.E.2d 826, 837 (2007) (quoting *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970)).

## IV.
## CHOICE OF LAW

{21} As a threshold matter, the Court must determine whether North Carolina law applies to the claims in this case. The Stonewall Packaging, LLC Agreement ("LLC Agreement") includes a choice of law provision requiring that "[a]ll issues and questions concerning the construction, validity, enforcement and

interpretation of this Agreement . . . be governed by, and construed in accordance with, the laws of the State of Delaware . . . ." (LLC Agreement § 14.6.) Defendant Jackson Paper argues this provision requires that "all of the claims in this lawsuit . . . [be] governed by Delaware law." (Defs. Jackson, Campbell, and Murphy's Br. in Supp. of Mot. to Dismiss 20.)

{22} Plaintiffs' claims deal with alleged torts and violations of the NCSA, not the construction, validity, enforcement, or interpretation of the LLC Agreement entered into by the members of Stonewall. While the LLC Agreement's choice of law provision would control enforcement of the LLC Agreement itself, the provision does not control the claims in this case. *See Mosteller Mansion, LLC v. Mactec Eng'g & Consulting of Georgia, Inc.*, No. COA07-664, 2008 N.C. App. LEXIS 1011, at \*7–8 (N.C. Ct. App. May 20, 2008) (holding that the choice of law provision within the parties' contract required the application of Georgia law to plaintiffs' claims for breach of contract, but would not apply to plaintiffs' tort claims).

{23} With regard to Plaintiffs' alleged tort claims, *lex loci delicti* ("*lex loci*") is the appropriate choice of law test. *Harco Nat'l Ins. Co. v. Grant Thornton, LLP*, No. COA09-996, 2010 N.C. App. LEXIS 1648, at \*7–8, 698 S.E.2d 719, 722 (N.C. Ct. App. Sept. 7, 2010) (citing *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988)). The *Harco* court held that:

> our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by *lex loci*, the law of the situs of the claim, and remedial or procedural rights are determined by *lex fori*, the law of the forum. For actions sounding in tort, the state where the injury occurred is considered the situs of the claim. Thus, under North Carolina law, when the injury giving rise to a negligence or strict liability claim occurs in another state, the law of that state governs resolution of the substantive issues in the controversy.

*Id.* at \*7–9, 698 S.E.2d at 722–23 (emphasis added).

{24} North Carolina's appellate courts have not addressed the question of whether a claim brought under the NCSA is based in tort. Accordingly, this Court has looked to how similar statutory-based claims have been classified. A claim

under the NCSA is, in many ways, like an action under the Unfair and Deceptive Trade Practices Act ("UDTPA").[1] The NCSA contains an anti-fraud provision that imposes liability on a seller of securities if:

> (1) he made the sale 'by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the purchaser not knowing of the untruth or omission)' and (2) he 'does not sustain the burden of proof that he did not know, [and in the exercise of reasonable care could not have known,] of the untruth or omission.'

Russell M. Robinson, II, *Robinson on North Carolina Corporation Law*, § 15.04 (7th ed. 2010) (quoting N.C. GEN. STAT § 78A-56(a)(2)). Similarly, the UDTPA protects against a broad range of conduct and prohibits "unfair or deceptive acts or practices in or affecting commerce . . . ." N.C. GEN. STAT. § 75-1.1(a) (2011). It has also been noted, as Plaintiffs point out in their argument concerning the NCSA, that under the UDTPA "it is not necessarily true that all unfair trade practices constitute fraud . . . ." *Holley v. Coggin Pontiac, Inc.*, 43 N.C. App. 229, 241, 259 S.E.2d 1, 9 (1979). In addition, both acts are "the creation of . . . statute. [And], therefore, *sui generis*[,] . . . neither wholly tortious nor wholly contractual in nature . . . ." *Bernard v. Central Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 230, 314 S.E.2d 582, 584 (1984) (discussing the nature of unfair and deceptive trade practices claims in North Carolina) (emphasis added) (first and last omission in original).

{25} The UDTPA's status as neither wholly tortious nor contractual has led to a split of authority within our appellate courts on the appropriate conflict of law rule to be applied to claims under the UDTPA. *Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 15, 598 S.E.2d 570, 581 (2004); *Compare Andrew Jackson Sales v.*

---

[1] The Court recognizes that it is well established in North Carolina that "securities transactions are beyond the scope of N.C.G.S. 75-1.1." *Skinner v. E.F. Hutton & Co. Inc.*, 314 N.C. 267, 275, 333 S.E.2d 236, 241 (1985). However, the Court finds a comparison of the UDTPA and the NCSA instructive when trying to determine the appropriate choice of law rule because of the acts' similar statutory status, and that both, while regulating different areas of the economy, prohibit similar conduct. *See* James Snyder, Jr., *North Carolina Corporation Law and Practice*, 12:25(c) (4th ed. 2010) (stating that N.C. GEN. STAT. § 78A-56 is North Carolina's anti-fraud statute for securities transactions); *see also Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975) (holding that North Carolina's UDTPA prohibits unfair or deceptive acts or practices and that "[p]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts . . . .").

*Bi-Lo Stores*, 68 N.C. App. 222, 225, 314 S.E.2d 797, 799 (1984) (holding that the "significant relationship" test should be applied to UDTPA claims),[2] *with United Virginia Bank v. Air-Lift Associates*, 79 N.C. App. 315, 321, 339 S.E.2d 90, 93 (1986) (holding that in North Carolina, *lex loci* is the conflict of law rule to be applied to UDTPA claims).

{26}     The North Carolina Supreme Court last visited the issue of North Carolina's conflict of law rule in *Boudreau v. Baughman*.  In *Boudreau*, a non-resident plaintiff injured his foot on a metal chair while visiting a friend in the state of Florida.  Plaintiff claimed compensatory and punitive damages against the North Carolina defendant who manufactured the chair, alleging negligent design, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and strict liability.  Rejecting the trial court's grant of summary judgment for defendants based on North Carolina's statute of repose (upheld by the North Carolina Court of Appeals), the *Boudreau* court found that Florida law applied to the claims, holding that "matters affecting the substantial rights of the parties are determined by *lex loci*, the law of the situs of the claim, and remedial or procedural rights are determined by *lex fori*, the law of the forum." *Boudreau*, 322 N.C. at 335, 368 S.E.2d at 853–54 (emphasis added). While not controlling, federal courts interpreting the above cited split in authority have explained that when *Andrew Jackson Sales* was decided there was a nationwide trend to apply the significant relationship test to torts in general, and that the North Carolina Supreme Court's subsequent rejection of this trend in *Boudreau* indicates that North Carolina's courts would not be inclined to apply the significant relationship

---

[2] "The 'most significant relationship test' requires the court to examine various factors to determine which state has the most significant relationship to the occurrence giving rise to the suit. The law of the state with the most significant relationship is then applied." *Santana, Inc. v. Levi Strauss & Co.*, 674 F.2d 269, 273 (1982) (citing RESTATEMENT (SECOND) CONFLICT OF LAWS § 148 (1971) (outlining the factors to be considered under the significant relationship test)).

test to UDTPA claims. *United Dominion Indus. v. Overhead Door Corp.*, 762 F. Supp. 126, 128, n. 2 (1991).[3]

{27}    Like the torts of fraud and negligence, and claims brought under the UDTPA, claims under the NCSA are, at their heart, intended to prevent fraudulent and negligent behavior in the purchase and sale of securities. The *Boudreau* court rejected the national trend towards adopting the significant relationship test in tort actions, and instead limited its applicability to claims brought under statutes that explicitly provided for its use. *Id.* In addition, *Boudreau* was handed down after both *Andrew Jackson Sales* and *United Virginia Bank*. While the North Carolina Supreme Court has not determined the choice of law rule to be applied to claims brought under the NCSA, applying *lex loci* to actions authorized under the NCSA is consistent with both the application of *lex loci* in UDTPA actions as established in *United Virginia Bank*, and with the North Carolina Supreme Court's holding in *Boudreau v. Baughman*. Accordingly, this Court will apply *lex loci* in this case.

{28}    Under the *lex loci* rule, "'the law of the state where the plaintiff was injured controls the outcome of the claim.'" *Harco Nat'l Ins. Co.*, 2010 N.C. App. LEXIS 1648, at *12, 698 S.E.2d at 724 (quoting *Stetser*, 165 N.C. App. at 14–15, 598 S.E.2d at 580). A plaintiff's injury is sustained "in the state 'where the last act occurred giving rise to [the] injury.'" *Id.* (quoting *United Virginia Bank*, 79 N.C. App. at 321, 339 S.E.2d at 94). In order to determine which state's law applies here,

---

[3] *But see Simms Inv. Co. v. E.F. Hutton & Co.*, 688 F.Supp. 193, 200 (1988) (stating that for claims brought under North Carolina's securities laws "the court believes that . . . North Carolina['s] courts would apply the [most significant relationship test].")。 *Simms Inv. Co.* was decided on June 9, 1988, and accordingly, does not cite the North Carolina Supreme Court's decision in *Boudreau*, which was handed down seven days earlier. While the Court in *Simms Inv. Co.* cites to the North Carolina Court of Appeal's split on the appropriate choice of law rule in UDTPA claims, it perfunctorily adopts the application of the significant relationship test established in *Andrew Jackson Sales* without any analysis as to why that test would be more appropriate than the *lex loci* rule subsequently adopted in *United Virginia Bank*. The facts in *Simms Inv. Co.* are also distinguishable because they were characterized as fraud claims, as opposed to this action which is based in negligence. In addition, the reasoning in *Simms Inv. Co.* is questionable considering that the court in *Simms Inv. Co.* granted plaintiff's motion to reconsider and upon reconsideration found that no conflict of law problem existed. *Simms Inv. Co. v. E. F. Hutton & Co.*, 699 F. Supp. 543, 546 (1988).

the Court must determine the state where the last act occurred giving rise to Plaintiffs' injuries.

{29}   Our courts have not previously applied *lex loci* to NCSA claims based on negligence and negligent misrepresentations to induce investment. Unlike the torts of assault and battery, where the location of injury is relatively easy to determine, when dealing with alleged misrepresentations that occur over numerous meetings and discussions, determining where a corporate plaintiff was injured becomes a more difficult undertaking.  Recently, the North Carolina Court of Appeals applied *lex loci* for the first time to claims of negligence and negligent misrepresentation and adopted the test used to determine the location of injury in UDTPA claims.  *Harco Nat'l Ins. Co.*, 2010 N.C. App. LEXIS 1648, at *15, 698 S.E.2d at 725.  As noted above, there are obvious similarities between claims brought under the NCSA and the UDTPA.  This Court chooses to apply the test laid out by the Court of Appeals in *Harco Nat'l Ins. Co.* to Plaintiffs' claims of negligence, negligent misrepresentation, and those brought under the NCSA.

{30}   "[A]t a minimum, it is necessary for a North Carolina court, applying the *lex loci* test, to make some attempt to determine the state in which the injured party actually suffered harm." *Id.* at *17–18, 696 S.E.2d at 725–26.   Harm is suffered "'where the last act occurred giving rise to the injury.'" *Id.* at *12, 696 S.E.2d at 724 (quoting *United Virginia Bank,* 79 N.C. App. at 321, 339 S.E.2d at 94).  In cases where plaintiff's claims are based on alleged misrepresentations made in the business context, this does not necessarily equate to plaintiff's place of business.  *Id.* at *18–19, 696 S.E.2d at 725–26 (rejecting the bright line place-of-business/economic impact rule for determining the location of injury).  Instead the Court must take an in-depth look and determine whether the record in this case "sufficiently indicates the state where plaintiff[s] suffered the injury that gave rise to [their] claims." *Id.* at *19, 698 S.E.2d at 726.

{31}   The last act which gives rise to a plaintiff's injury will be different depending on the claims plaintiff alleges.  As was the case in *Harco Nat'l Ins. Co.*, a plaintiff's claim for negligence is complete when plaintiff suffers actual injury or

loss.  *Harris v. DaimlerChrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006) (stating that the elements of negligence are "the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain *actual injury or loss* sustained by the plaintiff" (emphasis added)).  Similarly, a claim for negligent misrepresentation is complete when plaintiff has relied to its detriment on information prepared without reasonable care by a defendant who owed a duty to plaintiff.  *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 40, 626 S.E.2d. 315, 321 (2006) ("'[T]he tort of negligent misrepresentation occurs when a party justifiably *relies to his detriment* on information prepared without reasonable care by one who owed the relying party a duty of care.'" (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (emphasis added))).  However, unlike the claim of negligence, which requires plaintiff suffer damages, and negligent misrepresentation, which requires that plaintiff rely to its detriment, a claim for violation of the NCSA is complete upon the "[o]ffer[ing] or s[ale] of a security" by means of an untrue statement or omission of a material fact.[4]  N.C. Gen. Stat. § 78A-56(a)(2) (2011).

{32}    Here, as to Plaintiffs' claims for negligence and negligent misrepresentation, it might be presumed that the last act occurred where Plaintiffs made their initial investments in Stonewall.  Plaintiffs did not, however, suffer any loss or harm at that time, and thus a cause of action had not yet accrued.  *See Pierson v. Buyher,* 330 N.C. 182, 186, 409 S.E.2d 903, 906 (1991) (holding that a cause of action does not accrue on the mere possibility of an injury).  As was the case in *Harco Nat'l Ins. Co.,* Plaintiffs' causes of action did not accrue until they suffered injury (negligence), or their reliance on Defendants' information proved detrimental (negligent misrepresentation).  Looking to where the last act occurred giving rise to Plaintiffs' injury, this Court finds that the receiver's sale of

---

[4] As is discussed below, in order for a plaintiff to sufficiently plead a violation of the NCSA it must allege that defendant: (a) sold or offered to sell a security, (b) by means of an untrue statement or omission, and (c) that the untrue statement or omission was of a material fact. N.C. Gen. Stat. § 78A-56(a)(2) (2011).

Stonewall's assets was the last act which gave rise to Plaintiffs' claims because it was at that moment that Plaintiffs were stripped of assets in which they held an ownership interest as members of the corporation. *See Harco Nat'l Ins. Co.*, 2010 N.C. App. LEXIS 1648, at *20–21, 696 S.E.2d at 726 (holding that the last act occurred when "plaintiff involuntarily parted with tangible property"). Because Stonewall's plant was constructed and its operations located solely in Sylva, North Carolina, the receiver's sale of Stonewall's assets would be in North Carolina and accordingly, where the last act occurred. (Compl. ¶¶ 117, 140; Def. Jackson, Campbell, and Murphy's Br. in Supp. of Mot. to Dismiss 20.) Thus, North Carolina law controls Plaintiffs' claims of negligence and negligent misrepresentation.

{33} As to Plaintiffs' NCSA claim, the last act giving rise to injury was the offer or sale of a security. N.C. GEN. STAT. § 78A-56(a)(2) (2011). In this case, that act occurred at different times for each Plaintiff. Plaintiffs API and the Dorrises were sent a letter by Defendant Davis requesting investment on September 10, 2007 (Compl. ¶ 58.); Defendant West telephoned Plaintiffs Ramsey and CFB about investment in the spring of 2008, and Plaintiff Ramsey in his individual and representative capacity as President of Plaintiff CFB, visited the Sylva location with all Defendants on June 12, 2008 (Compl. ¶¶ 88, 91.); Plaintiff CFB Associates invested on or about July 2, 2009 (Compl. ¶ 115.); and Plaintiff Sirrod invested on July 3, 2009. (Compl. ¶ 114.)

{34} It is unclear from the record exactly where the relevant Defendants were when they made the offers or to where payment for the sale of securities was directed. However, Defendant Jackson Paper "retained Defendant Davis . . . to begin exploring the idea of bringing together a group of independent sheet plants to build a recycled linerboard mill," (Stonewall). (Compl. ¶ 41.) In addition, all of the offers upon which Plaintiffs relied were made by one or more of the Defendants employed by Jackson Paper and who acted as representatives of Jackson Paper. (Compl. ¶¶ 15–16, 35, 41, 47–49, 58, 88, 91.) Jackson Paper is a Delaware corporation registered to do business in North Carolina with its principle place of business in Sylva, North Carolina. (Compl. ¶ 14.) This Court finds that the letters,

telephone calls, and visits to Jackson Paper were made and hosted by employees or agents of Jackson Paper, a corporation with its principle operations within North Carolina. In addition, it is more likely than not that the letters and phone calls also originated from North Carolina because of the many communications made between Defendants and Plaintiffs concerning investment in Stonewall. Accordingly, the last act to offer or sell a security occurred in North Carolina and, thus, North Carolina law will be applied to Plaintiffs' NCSA claim.[5]

V.

NORTH CAROLINA SECURITIES ACT

A.

LEGAL STANDARD

{35}    Section 78A-56(a)(2) of the North Carolina General Statutes allows a claim to be brought against anyone who sells a security:

> by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . .

N.C. GEN. STAT. § 78A-56(a)(2) (2011).

{36}    A security is defined as any:

> note; stock; treasury stock; bond; debenture; evidence of indebtedness; *certificate of interest or participation in any profit-sharing agreement*; collateral-trust certificate; preorganization certificate or subscription; transferable share; *investment contract* including without limitation any investment contract taking the form of a whiskey warehouse receipt or other investment of money in whiskey or malt beverages; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in

---

[5] *See also* N.C. GEN. STAT. § 78A-63(a) (2011) (stating that Section 78A-56 "appl[ies] to persons who sell or offer to sell when (i)an offer to sell is made in this State, or (ii) an offer to buy is made and accepted in this State."). "[A]n offer to sell or to buy is made in this State, whether or not either party is then present in this State, when the offer (i) originates from this State or (ii) is directed by the offeror to this State and received at the place to which it is directed . . . ." N.C. GEN. STAT. § 78A-63(c) (2011).

payments out of production under a title or lease; viatical settlement contract or any fractional or pooled interest in a viatical settlement contract; or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

N.C. GEN. STAT. § 78A-2(11) (2011) (emphasis added).

{37}    Investment contracts are defined as:

[a]ny investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor. . . . and [a]ny investment by which an offeree furnishes initial value to an offeror, and a portion of this initial value is subjected to the risks of the enterprise, and the furnishing of this initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind over and above the initial value will accrue to the offeree as a result of the operation of the enterprise, and the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

18 N.C. ADMIN CODE 6A.1104(8)(a-b) (2011).  A common enterprise is "an enterprise in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of a third party . . . ." *Id.* at (8)(a).

{38}    Section 78A-56 is the NCSA's "antifraud" provision and not only proscribes fraud in securities transactions, but also has the complementary effect of mandating full disclosure of material facts in securities offerings.  James Snyder, Jr., *North Carolina Corporation Law and Practice*, 12:25(c) (4th ed. 2010).  A claim based in fraud cannot be pled under the normal notice pleading standards because under Rule 9(b) of the North Carolina Rules of Civil Procedure, averments of fraud must be pled with particularity.  N.C. R. Civ. P. 9(b); *See Terry v. Terry*, 302 N.C. 77, 84, 273 S.E.2d 674, 678 (1981).

{39}    The NCSA also requires that the facts being misrepresented be material.  North Carolina courts have adopted the materiality standard established by the United States Supreme Court in *TSC Industries, Inc. v. Northway*, which

provides that a fact is material when "'there is a substantial likelihood that a reasonable purchaser would consider it important in deciding whether or not to purchase.'" *State v. Williams*, 98 N.C. App. 274, 280, 390 S.E.2d 746, 749 (1990), *rev. denied*, 327 N.C. 144, 394 S.E.2d 184 (1990) (quoting *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

B.

ANALYSIS

1.

CLAIMS BASED IN NEGLIGENCE UNDER THE NCSA

{40}     Defendants first challenge the sufficiency of Plaintiffs' pleadings by arguing that the Complaint fails to meet the particularity requirements of Rule 9(b) of the North Carolina Rules of Civil Procedure. (Def. West Br. in Supp. of Mot. to Dismiss 14; Defs. Jackson, Campbell, and Murphy Br. in Supp. of Mot. to Dismiss 9–10; Def. Davis Br. in Supp. of Mot. to Dismiss 6–7.) Plaintiffs argue that the requirements of Rule 9(b) are inapplicable here because their claims under the NCSA are of negligence, not fraud, and therefore can be pled generally. (Pls.' Resp. in Opp. to Defs.' Mots. to Dismiss 10–15.) Because the NCSA is generally referred to as an anti-fraud statute, Plaintiffs' contention calls into question whether the NCSA provides a civil remedy for claims based in negligence. North Carolina's courts have not previously been presented with the question of whether the NCSA's civil remedy covers claims based in negligence. For that reason, this Court has looked to outside authority for guidance.

{41}     The language used in Section 78A-56(a)(2) of the NCSA is similar to that used in Section 78A-8 of the Act. *Compare* N.C. GEN. STAT. § 78A-56(a)(2) (2011) (imposing liability on any person who offers or sells a security "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ."), *with* N.C. GEN. STAT. § 78A-8(2) (2011) (making it unlawful for a person, in connection with the sale of a security to "make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . .”).  The North Carolina Court of Appeals has held that Section 78A-8 of the NCSA “closely parallels the Rule 10b-5 antifraud provision of the Securities Exchange Act . . . [and that c]ases construing the federal rule are instructive when examining our statute.” *State v. Davidson*, 131 N.C. App. 276, 282–83, 506 S.E.2d 743, 748 (1998); *see also State v. Williams*, 98 N.C. App. 274, 280, 390 S.E.2d 746, 750 (1990) (finding that Section 78A-8 closely parallels Rule 10b-5).

{42}    Rule 10b-5 was created by the Securities and Exchange Commission (the “Commission”) pursuant to the power given to them by Congress through the Securities Act of 1934 (the “Act”), 48 Stat. 891, 15 U.S.C. § 78j(b).  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).  Section 10b of the Act makes it unlawful for any person “[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.”  15 U.S.C. § 78j(b) (2006).  Under this authority, Rule 10b-5 makes it unlawful for any person to “make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .”  17 C.F.R. § 240.10b-5(b) (2011).  The language of Rule 10b-5 is virtually identical to the language of Section 78A-56(a)(2) that prohibits the sale of a security “by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.”  N.C. GEN STAT. § 78A-56(a)(2).

{43}    In *Ernst & Ernst v. Hochfelder*, the United States Supreme Court granted certiorari in an action brought by investors of an investment firm, First Securities Company of Chicago (“First Securities”), that had retained defendant accounting firm to audit their books and records.  425 U.S. at 188–89.  First Securities had sold plaintiffs fraudulent securities, however, this fact was not

discovered until the President of the firm committed suicide and disclosed in a note that he had, over the course of years, converted plaintiffs' investment funds for his own personal use. *Id.* at 189. Plaintiffs brought suit charging that defendant had aided and abetted First Securities' President's violation of Section 10(b) of the Act and Securities and Exchange Commission Rule 10b-5, 17 CFR § 240.10b-5 (1975). *Id.* at 190. Plaintiffs' claims were based on allegations that defendant had:

> 'aided and abetted' [the president's] violations by its 'failure' to conduct proper audits of First Securities. . . . [Plaintiffs'] cause of action rested on a theory of negligent nonfeasance. The premise [being,] that [defendant] had failed to utilize 'appropriate auditing procedures' [and] . . . thereby fail[ed] to discover internal practices of the firm said to prevent an effective audit. . . . [Plaintiffs] specifically disclaimed the existence of fraud or intentional misconduct on the part of [defendant].

*Id.* The question before the Court was "whether a private cause of action for damages will lie under § 10(b) and *Rule 10b-*5 in the absence of any allegations of 'scienter' – intent to deceive, manipulate, or defraud." *Id.* at 193. The Supreme Court held that "[v]iewed in isolation[,] the language of [Rule 10b-5] . . . could be read as proscribing, . . . any type of material misstatement or omission, . . . that has the effect of defrauding investors, whether the wrongdoing *was intentional or not.*" *Ernst & Ernst v. Hochfelder*, 425 U.S. at 212 (emphasis added). However, the Court went on to hold that actions brought under Rule 10b-5 could not be based in negligence because the rule was adopted under authority given to the Commission by Section 10b of the Act, which Congress did not intend to extend to "actions premised on negligent wrongdoing." *Id.* at 210.

{44}   Like the court in *Ernst & Ernst,* this Court is presented with the question of whether a cause of action without allegations of fraud or scienter lies under the relevant securities act. While the court in *Ernst & Ernst* was interpreting Rule 10b-5, the nearly identical language of Securities and Exchange Rule 10b-5 and Section 78A-56(a)(2) of the NCSA, makes the question before the Court in *Ernst & Ernst* and this Court virtually identical. Thus, the Court is left to determine the intent of the legislature responsible for enacting the NCSA. Prior to 1991, Section 78A-56(a)(2) contained the same language as cited above, with the

exception that defendant's burden of proof was to show that he "did not know, and did not act in *reckless disregard* of the untruth or omission." N.C. GEN. STAT. § 78A-56(a)(2) (1990) (emphasis added). In 1991, the General Assembly heightened the defendant's burden by requiring that he show that he "did not know, and in the *exercise of reasonable care* could not have known, of the untruth or omission." 1991 N.C. Adv. Legis. Serv. 456 (LexisNexis) (emphasis added).

{45}    Under the pre-amendment statute, a defendant could be held liable if he either knew of the untruth, or was unaware of the untruth but acted with reckless disregard. *See* N.C. GEN. STAT. § 78A-56(a)(2) (1990). However, reckless disregard was not defined by statute. Within the law of torts, the level of culpability required for the standard of reckless disregard has been held to be less than that required for intentional conduct. *See Dickens v. Puryear*, 302 N.C. 437, 449, 276 S.E.2d 325, 333 (1981) (defining intentional conduct in the context of intentional infliction of emotional distress as the "'desire[] to inflict severe emotional distress . . . or know[ledge] that such distress is certain, or substantially certain, to result from his conduct . . . ,'" and reckless disregard as "'acts . . . in deliberate disregard of a high degree of probability that the emotional distress will follow.'" (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. i (1965))).

{46}    Further, the North Carolina Court of Appeals recently pointed out that Section 78A-56(a)(2), unlike fraud, does not explicitly require that the defendant act intentionally. *Latta v. Rainey*, 202 N.C. App. 587, 597–98, 689 S.E.2d 898, 908 (2010) (contrasting the elements of fraud with those of Section 78A-56 of the NCSA); *Compare* N.C. GEN. STAT. § 78A-56(a)(2) (2011), *with Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007) (stating "the following essential elements of actual fraud are well established: '(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974))).

{47}    Applying these distinctions to Section 78A-56, it becomes apparent that both the pre and post-amendment versions of the statute require a defendant show that he was without knowledge of the untruth or omission. *Compare* N.C. GEN. STAT. § 78A-56(a)(2) (1990), *with* N.C. GEN. STAT. § 78A-56(a)(2) (2011). It would be an obvious and egregious *non sequitur* for a defendant who intended to defraud a potential investor to be able to avoid liability by claiming that that he did not act recklessly or without reasonable care towards the fraud he intended to perpetrate. It would logically follow from such argument that intentional conduct could never be rebutted by a defendant. Thus, prior to the 1991 amendment, liability could be imposed when a defendant was unaware of the untruth, but acted with reckless disregard of the truth or falsity of the statement or omission. N.C. GEN. STAT. § 78A-56(a)(2) (1990). The statute's initial use of a "reckless disregard" standard indicates that the legislature intended to provide a cause of action for a defendant's conduct that was less than intentional. This purpose is confirmed by the 1991 amendment to the NCSA, which expands liability to include the sale of securities through the use of untrue statements made without the exercise of reasonable care. 1991 N.C. Adv. Legis. Serv. 456 (LexisNexis).

{48}    The current language of "reasonable care" sounds more of negligence than fraud. *See Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 226, 695 S.E.2d 437, 441 (2010) (holding that in a claim for negligence, liability can be imposed when "'by the exercise of *reasonable care* the defendant might have foreseen that some injury would result from his conduct or that consequences of a generally injurious nature might have been expected'" (quoting *Slaughter v. Slaughter,* 264 N.C. 732, 735, 142 S.E.2d 683, 686 (1965) (emphasis added))); *see also Jay Group Ltd. v. Glasgow*, 139 N.C. App. 595, 600, 534 S.E.2d 233, 236 (2000) (stating "'the tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without *reasonable care* by one who owed the relying party a duty of care.'" (quoting *Hudson-Cole Development Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999) (emphasis added))). Accordingly, after review of the applicable statutes and relevant case law, this

Court concludes that the legislature intended for the civil remedy provided under Section 78A-56 of the NCSA to include claims based on negligence and negligent misrepresentations. As such, Plaintiffs' claims are proper.

2.

PLEADING STANDARD

{49} Having determined that Plaintiffs' claims based in negligence may be pled under the NCSA, the Court next addresses whether such claims must meet "more exacting pleading requirements than are generally demanded by 'our liberal rules of notice pleading.'" *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002) (quoting *Stanford v. Owens*, 76 N.C. App. 284, 289, 332 S.E.2d 730, 733 (1985)). It is generally known and widely accepted among practitioners that when pleading claims under Section 78A-56 it "is important . . . to remember that a claim under the antifraud provisions cannot be ple[d] under the normal notice pleading standards because an averment of fraud must be ple[d] with particularity." Snyder, *supra* § 12:25(c). This practice derives from Rule 9(b) of the North Carolina Rules of Civil Procedure which requires that "[i]n all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake . . . be stated with particularity." N.C.R. Civ. P. 9(b)

{50} Defendants argue that the particularity requirements of Rule 9(b) should be applied to this case. (Def. West's Br. in Supp. of Mot. to Dismiss 14–17; Defs. Jackson, Campbell, and Murphy's Br. in Supp. of Mot. to Dismiss 9–10; Defs. Davis and Capstone's Br. in Supp. of Mot. to Dismiss 6–7.) Notwithstanding the general practice of applying Rule 9(b)'s particularity standard to claims brought under the NCSA, unlike claims based in fraud, the rationale for requiring particularized pleading here is not well adapted to claims based in negligence. Accordingly, this Court finds that when claims brought under Section 78A-56(a)(2) are based in negligence rather than fraud, plaintiff need only meet the general notice pleading standard of Rule 8(c). *See* N.C.R. Civ. P. 8(c).

3.

SUFFICIENCY OF THE PLEADINGS

{51} To sufficiently plead a claim under Section 78A-56(a)(2) of the NCSA plaintiff must allege that Defendants: (a) sold or offered to sell a security, (b) by means of an untrue statement or omission, and (c) that the untrue statement or omission was of a material fact. N.C. GEN. STAT. § 78A-56(a)(2) (2011). Here, Plaintiffs have alleged that Defendants Campbell, Murphy, Davis, and West, either individually, or on behalf of their respective companies Jackson Paper and Capstone, requested that Plaintiffs invest in Stonewall; (Compl. ¶¶ 50, 58, 88–92, 143.) that Associated Packaging, the Dorrises, Sirrod, CFB, and CFB Associates invested into Stonewall and purchased membership interests; (Compl. ¶¶ 59–65, 96, 98–99, 114–15.) that Plaintiff Ramsey executed a personal guaranty to secure financing for equipment to be used in the operation; (Compl. ¶ 104.) that "Defendants sold or offered to sell membership interests in Stonewall by means of untrue statements . . . and/or by means of omissions[;]" (Compl. ¶ 143.) that Plaintiffs invested in Stonewall because of the untruths or omissions made by Defendants; and that these untruths or omissions were of material fact. (Compl. ¶¶ 64, 96, 98–99, 104, 108, 114–15, 145.)

{52} A security under the NCSA includes investment contracts. Plaintiffs have alleged that they were sold memberships in Stonewall and that Stonewall was a common enterprise that would return profits to the investors through the managerial efforts of individuals other than Plaintiffs. (Compl. ¶¶ 54, 59–65, 96, 98–99, 116–24.) Accordingly, Plaintiffs have sufficiently alleged that a security was offered and sold. Plaintiffs have also alleged that the sale was based on untruths or omissions of material fact. (Compl. ¶¶ 143, 145.) While a conclusory allegation that the untruths were material would be insufficient, here Plaintiffs have alleged additional facts in support of their assertion. (Compl. ¶¶ 61, 64–66, 96, 98–99, 104, 108, 114–15.) Thus, Plaintiffs have sufficiently alleged all of the elements to support a violation of the NCSA.

{53}    The Court, therefore, **DENIES** Defendants' Motions to Dismiss with respect to this claim.

VI.

NEGLIGENCE

{54}    Under North Carolina law, "the essential elements of any negligence claim are the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff." *Harris v. DaimlerChrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006).

{55}    The duty to protect others from harm arises whenever "A" is by circumstances placed in such a position with respect to "B" that a reasonable person in "A's" position will at once recognize that if he fails to use ordinary care and skill in his own conduct regarding those circumstances, he will cause injury to the person or property of "B". *See Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 666, 255 S.E. 2d 580, 583 (1979).

{56}    Ordinarily, a shareholder may not maintain an individual action against a third party for an injury that directly affects the corporation unless "the shareholder can show that the wrongdoer owed him a *special duty* or that the *injury suffered by the shareholder is separate and distinct* from the injury sustained by the other shareholders or the corporation itself. *Regions Bank v. Reg'l Prop. Dev. Corp.*, 2008 NCBC 8, ¶ 45 (N.C. Super. Ct. April 21, 2008), http://www.ncbusiness court.net/opinions/2008%20NCBC%208.pdf (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997) (emphasis added)).[6]

{57}    To proceed under the "special duty" exception, "the [special] duty must be one that the alleged wrongdoer owed directly to the shareholder as an individual." *Barger*, 346 N.C. at 659 (internal quotations omitted); *see also* Robinson, *supra* 17.02[1] (stating that the shareholder must show a loss peculiar to

---

[6] These are exceptions to the general rule established by the North Carolina Supreme Court in *Barger* that states that, "shareholders cannot pursue individual causes of action against third parties for wrongs or injuries to the corporation that result in the diminution or destruction of the value of their stock." *Barger*, 346 N.C. at 658.

himself to maintain a direct claim).

{58}  "[N]egligence liability [may] be imposed, in appropriate circumstances, to protect the foreseeable interests of third parties not in privity of contract." *Howell v. Fisher*, 49 N.C. App. 488, 493, 272 S.E.2d 19, 23 (1980).  These situations have allowed "third part[ies], not in privity of contract . . . [to] recover for negligence which proximately causes a foreseeable economic injury."  *Id.* at 494, 272 S.E.2d at 23.  In *Howell*, the Court of Appeals was asked to decide whether plaintiffs, who were investors in a corporation, had sufficiently stated an individual rather than derivative claim where "defendants' agent, personally delivered and exhibited copies of [a] report . . . for the purpose of inducing [plaintiffs] to invest in the corporation."  *Id.* at 496, 272 S.E.2d at 25.  The court held that "plaintiffs ha[d] stated an individual claim in negligence for injuries 'peculiar or personal' to themselves . . . ."  *Id.* at 498, 272 S.E.2d at 26.  Courts have also interpreted situations where a special duty arose to include negligent misrepresentations made by officers or directors to induce individuals to buy stock.  *Id.* at 498, 272 S.E.2d at 26; Robinson, supra 17.02[1] (citing *Bane v. Powell*, 192 N.C. 387, 391, 135 S.E. 118 (1926)); *Harris v. Wachovia Corp.*, 2011 NCBC 3, at ¶ 53 (N.C. Super. Ct. Feb 23, 2011), http://www.ncbusinesscourt.net/opinions/2011_NCBC_3.pdf (stating that "[a] special duty has been found when an individual was induced to become a shareholder by the wrongful actions of a party."  (citing *Howell*, 49 N.C. App. at 498, 272 S.E.2d at 26));  *see also Allen v. Ferrera*, 141 N.C. App. 284, 291, 540 S.E.2d 761, 766 (2000) (holding that "negligent misrepresentation by a third party which induced plaintiffs to become shareholders created . . . a special duty.").

{59}  Plaintiffs must also take reasonable steps in relying on the information provided for investment. "'[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence.'"  *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 59, 554 S.E.2d 840, 846–47 (2001) (quoting *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999)) (holding

that plaintiff's failure to allege that it was denied the opportunity to investigate or could not have learned of the untruth through reasonable diligence defeated its claim for negligence).

{60} Here, Plaintiffs allege: that leading up to their respective investments in Stonewall, Defendants prepared and provided documents and information concerning Stonewall's financial viability; (Compl. ¶¶ 54, 57, 62, 78, 93–94, 106.) that these documents were intended to induce Plaintiffs' investment in Stonewall and constituted representations on the part of Defendants that created a duty to provide Plaintiffs with "accurate information[;]" (Compl. ¶ 148.) that Defendants breached their duty by providing inaccurate information and by not exercising reasonable care to ensure that the information given to Plaintiffs was accurate; (Compl. ¶ 149.) and as a result of Defendants' alleged breach, Plaintiffs lost significant sums of money invested in Stonewall. (Compl. ¶¶ 4–5, 150.)

{61} As was the case in *Howell*, while Defendants and Plaintiffs in this case were not in privity of contract, Plaintiffs have sufficiently alleged a relationship wherein Defendants provided investment advice upon which they knew Plaintiffs would rely. Accordingly, Defendants' representations, and the forseeability that Plaintiff would rely on them, imposed a duty on Defendants to use reasonable care in the production of their investment materials. *See Howell,* 49 N.C. App. at 493–98, 272 S.E.2d at 23–26. Plaintiffs also adequately allege that Defendants negligently prepared documents containing false or misleading information, communicated that information to Plaintiffs, and because of those misrepresentations, Plaintiffs were injured. While the element of causation has been pled, it has also generally been held to be an inference of fact to be drawn from other facts and circumstances, and ordinarily a question for the jury. *Taylor v. Interim Healthcare of Raleigh-Durham,* 154 N.C. App. 349, 353, 574 S.E.2d 11, 14 (2002). As to Plaintiffs' ability to discover the truth upon inquiry, the Court finds that Plaintiffs alleged that they had an accountant review the financial information provided by Defendants. (Compl. ¶ 109.) The accountant's inability to detect any irregularities supports Plaintiffs' contention that they could not have discovered the

truth. Accordingly, the Court concludes that Plaintiffs have sufficiently pled a claim for negligence.

{62} The Court hereby **DENIES** Defendants' Motions to Dismiss with respect to this claim.

VII.

NEGLIGENT MISREPRESENTATION

{63} Plaintiffs' cause of action for negligent misrepresentation is closely related to their claim for negligence in that they both are predicated on allegations that Defendants failed to use reasonable care in the preparation of financial documents and advice that were intended to induce Plaintiffs to invest in Stonewall.

{64} "Our Supreme Court has held that 'the tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.'" *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 40, 626 S.E.2d. 315, 321 (2006) (quoting Raritan *River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988)). However, a shareholder generally can not recover individually for an injury to the corporation that results in loss of stock value. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997). An exception to this rule occurs "if the [shareholder or] guarantor can show . . . that the wrongdoer owed him a special duty." *Id.* "[N]egligent misrepresentation by a third party which induced plaintiffs to become shareholders create[s] such a special duty." *Allen v. Ferrera*, 141 N.C. App. 284, 291, 540 S.E.2d 761, 766 (2000). "Applying the same rule, our Supreme Court held . . . that negligent misrepresentation by a third party that induce[s] plaintiff[] to personally guarantee a corporation's loans likewise create[s] such a special duty." *Id.* (citing *Barger*, 346 N.C. at 658, 488 S.E.2d at 219). "'[W]hether liability accrues is highly fact-dependent, with the question of whether a duty is owed a particular plaintiff being of paramount importance.'" *Marcus Bros. Textiles, Inc. v. Price Waterhouse, L.L.P.*, 350 N.C. 214, 220, 513 S.E.2d 320, 325 (1999) (citations omitted).

{65}     Even if a misrepresentation is made, plaintiff will only be able to recover if his reliance was justified.  "[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence."  *Oberlin Capital, L.P.*, at 59, 554 S.E.2d at 846–47 (quoting *Hudson-Cole Dev. Corp.*, at 346, 511 S.E.2d at 313).  This is not to say that "[t]he law . . . require[s] a prudent man to deal with every one as a rascal."  *Gary v. Jenkins*, 151 N.C. 80, 83, 65 S.E. 644, 645 (1909).  A plaintiff is not barred from recovery because he had a lesser opportunity to investigate representations made by someone with superior knowledge.  *See Phelps-Dickson Builders, L.L.C. v. Amerimann Partners,* 172 N.C. App. 427, 438, 617 S.E.2d 664, 671 (2005).  In close cases, those who deceive or are negligent in their duties should not be able to tell an unknowing investor that "[y]ou ought not to have trusted me. If you had not been so gullible, ignorant, or negligent, I could not have deceived you."  *Id.* (quoting *Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965)).  The question of whether reliance was justifiable is a jury question, "'unless the facts are so clear as to permit only one conclusion'" *Marcus Bros. Textiles*, 350 N.C. at 225, 513 S.E.2d at 327 (citations omitted).

{66}     Here, as is indicated in this Court's discussion of Plaintiffs' negligence claim, Defendants' relationship with Plaintiffs created a special duty to take reasonable care in the preparation and relay of investment information to Plaintiffs. *See Marcus Bros. Textiles*, 350 N.C. at 220, 513 S.E.2d at 325; *see also Allen v. Ferrera*, 141 N.C. App. 284, 291, 540 S.E.2d 761, 766 (holding that "negligent misrepresentation by a third party which induced plaintiffs to become shareholders created . . . a special duty.").  Plaintiffs have alleged that Defendants were negligent in their preparation of the information provided Plaintiffs, and that Plaintiffs relied on that information to their detriment.  (Compl. ¶¶ 155, 157.)  Notwithstanding both parties' knowledge and familiarity with the paper and corrugated products industry, and it being unnecessary to determine whether reliance was justified in a Motion to Dismiss, Plaintiffs also allege that they had an accountant review the

financial information provided by Defendants. (Compl. ¶ 109.) The accountant's inability to detect any irregularities in the information Defendants provided supports Plaintiffs' contention that they were unable to discover the truth by the exercise of reasonable diligence. Accordingly, Plaintiffs have sufficiently stated a claim for negligent misrepresentation.

{67} The Court, therefore, **DENIES** Defendants' Motions to Dismiss with respect to this claim.

VIII.

CONCLUSION

{68} **WHEREFORE**, Plaintiffs' causes of action against Defendants for violation of the NCSA, negligence, and negligent misrepresentation have been sufficiently pled. The Court also finds that Plaintiffs have sufficiently alleged injury in fact and thus have standing to pursue the claims alleged. The Court, therefore, **DENIES** Defendants' Motions to Dismiss with respect to all claims.

**SO ORDERED**, this the 1st day of March, 2012.